MARSHAIvT, Chief Justice.
Richard Brooke, by his last will, empowered his executors to sell his whole estate, and William Garnett, the plaintiff, alone proved the will, and took the executorship upon himself.
On the 10th of June, 1818, William Garnett, sold the estate called Mantapike, to William H. Macon, the defendant, “for the sum of twenty-two dollars per acre ; six thousand dollars of which are to be paid on the first day of January next, when possession will be given, and the balance in two equal’ annual payments from that date, which said two last payments, are to be secured by mortgage, on the said land. 'The said William Garnett farther agrees to put the present -corn-field land, in wheat, the said William H. Macon furnishing the seed. And it is farther agreed, that the said William H. Macon is to have power *to make this agreement valid in one month from the date hereof, or to make the same null, and of no effect, by giving due notice to the said William Gar-nett, to that purport, within the time aforesaid..
On the 22d of August, William H. Macon, paid William Garnett, four thousand dollars, in part of the first payment; but having received notice afterward, that George Brooke, who devised Mantapike to Richard, had by his last will, charged his whole estate with the payment of his debts; and had in his life-time, become surety for Carter Brax-ton, in a large sum, to Robert Campbell, for which a decree had been pronounced in the court of chancery, against Carter Braxton, Robert Price, executor of George Brooke, and against the representatives of Robert Page, who was also surety for Carter Braxton, which decree was affirmed in the court of appeals, in October 1799, and remains unsatisfied ; and being advised by counsel, that he, having notice thereof, the estate called Man-tapike, would be charged with the said debt in his hands; he, on the 16th of December, addressed the following letter to the plaintiff :
“ Sir, — I am informed that Colonel George Brooke, the former owner of the Mantapike tract of land, became Carter Braxton’s security for a large debt to Robert Campbell, and by his will, charged his lands with the payment of his debts ; that the debt to Campbell is still due, and that the Mantapike lands are liable to be soid for the payment thereof. I, therefore, think proper to inform you, that I consider the contract, which I made with you, for the purchase of the said tract of land, as void ; and request you; to return me the four thousand dollars, which I paid you, in part of the purchase money, with interest.
“ I am, sir, very respectfully,
“ W. H. Macon.”.
On the 26th of the same mon-th, William Garnett, instituted his suit in the court of chancery of the state, against William H. Macon, and against the representatives of Robert Campbell, praying for a specific performance of the ^contract, and insists in his bill, that the estate called Mantapike would not be chargeable with the debts of George Brooke, in the hands of a purchaser ; and insists also, for several reasons, which are detailed at length, that George Brooke was not liable for the debts to Campbell, and that- his devisees were not bound by the decree against his executor, or estopped from contesting the claim.
The chancellor was of opinion, that Brooke had been released by the conduct of Campbell, and that a specific performance of the contract ought to be decreed, and directed an account of the rents and profits of the estate received by the plaintiff since the sale ; but, information was received of Campbell’s death, on which the suit abated as to him, and, was revived against William Keith, his, representative, who appeared and petitioned that the cause should be removed into this court; which was ordered t accordingly.. Keith, as the representative of Campbell, has also filed a bill against the representatives, heirs and deyisees of George Brooke, praying that his debt may be paid ; and to this bill, William H. Macon is made a defendant ; but this suit is not ready for trial.
In May 1820, William H. Macon filed his answer, in which he insists, that he ought to stand discharged from his contract, on account of the lands being incumbered with Campbell’s debt, of which he had no notice, and that hepurchased, “ supposing the said, Mantapike tract of land was free from in-cumbrances and charges of all kinds, except a mortgage by Richard Brooke to general Young, which was represented as of-no great amount, and which the compla-inant was to pay off, before he made a deed for the land to this defendant, but has failed to do so, as this defendant understands.”
He says, that on examining the records, which he did, in consequence of receiving notice of Campbell’s debt, he found the question to be so perplexed and intricate, that the controversy would probably not be determined during his life,, in consequence of which, he resolved to abandon the ^contract, and addressed a letter to the plain tiff giving notice of his resolution. That in consequence thereof, as he presumes, the complainant kept possession of the tract of land, failed to tender a deed to the defendant for it, or to demand the instalment in January 1819 ; and paid for the seed wheat which Macon had purchased to seed the cornfield, according to the written contract; thus exhibiting every mark of a reciprocal abandonment of the contract on his part; and he gave no indication to the contrary till the institution of this suit, several months after-wards.
In argument, the first point which has been made by the defendant Macon, is, that the contract was abandoned by both parties.
It is not pretended that there has been any express or formal abandonment on the part *1174 of the plaintiff. The allegation is, that it is to be implied from his conduct. To sustain this implication, the conduct of the vendor ought to be such as to justify a reasonable man in believing, that he acquiesced in the decision of the vendee, to abandon the contract ; it ought to be such as might reasonably influence the conduct of the vendee, and induce him to regulate his own affairs on the presumption that he was no longer incumbered by his contract. The attempt of the vendor to re-sell estate, or the unequivocal exercise of ownership over it, unaccompanied with any explanation shewing that he still considered the contract as binding, might be such an act; but there has been no attempt to re-sell the estate, nor any unexplained act of ownership over it. On the contrary, a subpoena was taken out within ten days after the date of the letter of abandonment, and the bill, since filed in consequence of this subpoena,, claims a specific performance.
Had the bill been immediately filed, and the subpoena executed, this point, it is presumed, would not have been made ; but the bill was not filed until June 1819, and the subpoena was not returned executed, until January 1820.
From these circumstances, the counsel for the defendant claim the same advantages to their client, as if the plaintiff *had acquiesced silently in his letter of the 16th of December, 1818, until the service of the subpoena informed him, that a suit'was depending. But I do not think this claim can be supported.
No laches aré imputable to the plaintiff. His determination to insist on the contract, seems to have been immediate; and the measures taken by him in pursuance of that determination were sufficiently prompt. A subpoena was issued, on the 10th day after the date of colonel Macon’s letter, but there was not time to execute it. New process was directed, and the law makes it tbe duty of the officers of the court, to attend to that process. I do not think the delay which took place in executing it, can be justly imputed to colonel Garnett, nor ought any forfeiture of right to be the consequence of that delay, unless some, injury to colonel Macon, had resulted from it. No injury is shewn or alleged, nor is it probable that any can have 'arisen. From the vicinity, of the two gentlemen to each other, their rank in life, the common.conversations which grow out of such Controversies, the interest which the parties took in it, and the enquiries they would naturally make, it is not reasonable to suppose, that while the vendor was in fact actively pressing his suit, and continually issuing new process, the ven-dee could act upon the presumption that he had abandoned his contract. But if these circumstances, which generally accompany transactions of this character, cannot be considered as belonging to this cause, the record, I think, furnishes satisfactory evidence, that colonel Macon, was apprised of the determination of colonel Garnett, to insist on the specific performance óf the contract. Thomas G. Smith, deposes to a conversation with colonel Macon, in which that gentleman said, that though the counsel consulted by him had been of opinion that Mantapike was bound for Campbell’s debt, the counsel consulted by William Garnett had advised otherwise, and that William Garnett said, he did not think himself at liberty, as a representative, to cancel the bargain.
*The deposition of James M. Garnett too, though less explicit, bears on the same point. The very fact, that the vendee did not repeat his demand for re-payment of the four thousand dollars, he had advanced, shews, that he did not suppose the' vendor had relinquished the contract.
Since then, the vendor did never in fact, relinquish the contract, but took early measures to enforce its specific performance; since the delay which took place in the service of process, did not proceed from him, and did not produce any real mischief to the vendee, I cannot think that the right to enforce a specific performance is-in any degree affected by that delay.
It has been also argued, that the vendor ought to have done all that was required from him, by the contract. He ought to have tendered possession and a conveyance, on the first of January, 1819.
He certainly might have done so. But when it is recollected that previous to the first of January, 1819, he had received a letter from the vendee, announcing his determination not to receive possession, or a conveyance, and had himself resorted to the laws for that remedy, which they afforded for a broken contract, I cannot think that the omission, if it may be so termed, ought to vary that remedy, so far as respects a specific performance, whatever might be its influence on other questions which would arise in the cause, should the contract be carried into execution.
I come now to consider the validity of the objections made by the vendee, to a specific performance of the contract, supposing it not to be abandoned. He complains, that the title is incumbered and embarrassed with liens, of which he had no knowledge when the contract was made ; and which would certainly have deterred him from making it, had they been communicated to him.
A court of equity compels the specific performance of contracts, because it is the intention of the parties that they shall be performed. But the person who demands it, must be in a capacity to do, substantially, all that he has promised, *before , he can entitle himself to the aid of this court. At what time this capacity must exist, whether it must be at the date of the contract, at the time it is to be executed, or at the time of the decree, depends, I think, upon circumstances, which may vary with every case. There is no subject which more requires the exercise of a sound discretion. The enquiry in every case of the kind, must be, whether the vendor could at the time, have conveyed such a title, as the vendee had a right to demand ? If he could not then, whether he can now ? And if he can, whether there has been such a change of circumstances, that a court of equity, ought not to compel the ven-dee to receive it ? The first and great objection to the title, is the lien supposed to be imposed on the Mantapike estate, by the will of George Brooke, for the payment of his debts.
In the year 1781, George Brooke, made his last will in writing, in which he devised as follows : “ After my just debts are paid, I give *1175 and dispose of the remainder of my estate, in the manner following-” &c. The testator was then seised and possessed of Mantapike, which he devised to his son Richard. Richard Brooke, entered upon the property devised to him, and remained in possession of it, until his death, which happened in the year 1816. By his last will, he empowered his executors, or such of them as might act, to sell his land. William Garnett, the plaintiff, alone qualified as executor to the will, and sold the land to the defendant William H. Macon, without any intimation of the existence of Campbell’s claim, or that George Brooke had charged his land with the payment of his debts.
He, now contends, that this claim constitutes no obstacle to a specific performance, of the contract, because : — First, It was not one of George Brooke’s just debts, at the date of his will, or at the time of his death. Second, If it was a just debt, it does not charge the estate in the hands of William H. Macon.
First. Is the claim now made by Keith, on the part of Campbell, for a debt, legally dtte from the estate of George Brooke, deceased ?
*As the suit for that claim is now depending, and is not yet ready for hearing, any positive decision respecting it, would, perhaps, be premature. It is, however, in the power of the court, to form opinions on some points of that case, subject, indeed, to future revision ; because the facts on which those points must certainly depend, are in the record; and it may be proper to do so, because, if the claim be obviously unfounded, the course of the court -would be different from what it ought to be, if any strong presumptions exist in its favour.
The defendants insist, that the decree against the personal representatives of George Brooke, is conclusive evidence against his devisee, of the existence of the debt.
The cases cited by counsel, in support of this proposition, do not decide the very point. Not one of them brings directly into question, the conclusiveness of a judgment against the executor, in a suit against the heir or devisee. They undoubtedly, show, that the executor completely represents the testator, as the legal owner of his personal property, for the payment of his debts in the first instance, and is, consequently, the proper person to contest the claims of his creditors. Yet, there are strong reasons for denying the conclusiveness of a judgment against an executor in an action against the heir. He is not a party to the suit, — cannot controvert the testimony, — adduce evidence in opposition to the claim, — or appeal from the judgment. In case of a deficiency of assets, the executor may feel no interest in defending the suit, and may not choose to incur the trouble or expense attendant on a laborious investigation of the claim. It would seem unreasonable that the heir, who does not claim under the executor, should be estopped by a judgment against him.
In the case against Munsford’s heirs, in this court, the question was decided against the conclusiveness of such a judgment, and I am not satisfied that the decision was erroneous.
*This case, however, varies from that, in a material circumstance. In that case, the heir was bound by the obligation of his ancestor, and was liable to the creditor directly. In this case, the creditor is bound to proceed against the executor and to exhaust the personal estate, before the lands become liable to his claim. The heir, or devisee, may indeed, in a court of chancery, be united with the executor in the same action, but the decree against him, would be dependent on the insufficiency of the personal estate. Since, then, the proceeding against the executor, is, in substance, the foundation of the proceeding against the heir, or devisee, the argument for considering it as prima facie evidence, may be irresistible, but I cannot consider it as an estoppel. The judgment not being against a person representing the land, ought, I think, on the general principle, which applies to giving records in evidence, to be re-examinable when brought to bear upon the proprietor of the land.
It was said, but not pressed, by the counsel for the plaintiff, that the decree of the court of chancery, was not even prima facie evidence against the representatives of George Brooke. I do not concur with him in this proposition ; but if I did, it would not, I think, materially affect this case. The decree was against Braxton, as well as against the representatives of Brooke and Page; and is admitted to be conclusive against Braxton and his representatives. They could never be permitted to deny that Braxton owed Campbell the money specified in that decree.
The undertaking, on which the decree was pronounced against Brooke’s executor, is dated in 1775, and promises, under seal, to stand security for Braxton to Campbell, for the sum then due. This sum is fixed by the decree against Braxton ; and the defence now set up for Brooke, does not controvert that decree as to Braxton, but insists on several circumstances which, as they contend, discharge Brooke from the liability incurred by his undertaking, as Braxton’s surety.
The first of these is, the release of Broad-neck, which had been mortgaged for the debt, in 1769, when the bills drawn *by Braxton and sold to Campbell, came back protested. William Aylett and George Brooke, became sureties to Campbell for this debt.
On the 21st day of May, in the year 1773, Campbell joined Braxton in a conveyance of the mortgaged premises to John Shermer, which is recorded in September, of the same year. On the 15th of December, 1775, Aylett and Brooke transmit to Campbell an instrument of writing under seal, which, after reciting a former undertaking as sureties for Braxton, contains these words: “We therefore, in consideration of our former agreement, do promise and oblige ourselves to stand security for the said Braxton to the said Campbell, his heirs, executors, administrators and assigns, for the sum of money now due from the said Braxton, to the said Campbell.”
It is contended for the plaintiff, that this suretyship was probably undertaken, in the confidence that the mortgaged property was amply sufficient to discharge the debt, and that Campbell, by releasing this property without the consent of the sureties, discharged them.
*1176 There would he great force in this objection, had the release of the mortgaged premises been dated subsequent to the engagement made by Aylett and Brooke. But that engagement was dated in December 1775, and the deed of conveyance by Braxton and Campbell to Shermer, was recorded in September 1773. No evidence exists, that either the mortgage or its release, was communicated to Aylett or Brooke, other than the presumption arising from the notoriety of such transactions, and from the fact that both deeds were recorded. These circumstances are precisely as strong to prove a knowledge of the deed to Shermer, as of the deed to Campbell, were it even proved, that the first bond of Aylett and Brooke, anteceded the deed to Shermer. The undertaking made in December 1775, cannot be presumed to have been induced by a deed of mortgage which had been released more than two years, and although it is expressed to be made in consideration of the prior undertaking, *yet that prior undertaking would not have been renewed, under circumstances, which, in the opinion of the parties themselves, absolved them from it, both in law and conscience. The fair inference from this renewal is, that the parties being mutual friends, the conveyance to Shermer was with the knowledge and assent of all.
The second objection arises'from a fact, which is considered as an implied release of Aylett from his joint obligation with Brooke.
On that instrument, is this endorsement: “Aug. 6th, 1777, X do oblige myself to perform every engagement that colonel William Aylett, was bound by the within, to perform, and to be considered as one of the securities of Wm. Braxton, in the room of colonel Aylett. Witness my ‘hand, this 6th day of Aug. 1777.
“ Robert Page.”
It is contended, that this endorsement must be considered as made with the consent of Campbell, who, from its terms, and from suing the representatives of Brooke and not of Aylett, must be considered as having agreed to discharge Aylett.
The inference is. X think, a fair one. The instrument always remained in possession of Campbell, who must be presumed to have been privy and assenting to the endorsement ; and who has avowed it, by his suit.
It is insisted, that the legal effect of this agreement is to discharge Brooke as well as Aylett, because the release of one joint obligor, releases the other.
It is obvious that the release of Brooke was not contemplated by the parties. If such be the effect of the instrument, an operation is given to the words, which they do not naturally import, and which the parties could never have foreseen or intended. If a positive rule of law require such a construction, the court must make it; but the construction can be justified only by a positive and well settled rule. The common rule of law, and it seems also, to be the rule of reason, is, that words shall subserve the intent; *but when the reverse of this rule is to be adopted, and both the words and the intent of an agreement are to yield to a technical principle, that principle ought to be sustained by decisions of unquestionable authority, the application of which, cannot be doubted.
The principle is, that a covenant never to put a bond in suit, is a release; and, it is also settled, that a release to one of several obligors, is a release to his co-obligors.
Both these points, have been frequently decided: and the plaintiff is certainly entitled to the benefit of those decisions, as far as they apply to his case.
The principle will be found in any abridgment, (a) or general treatise on the subject, with a reference to the cases, which establish it. In no one of them, does the obligation contain any other party, than him with whom the covenant is made. In all of them, the covenant, if broken, gives a right of action to the parties bound in the obligation, and the measure of their damages is given by the recovery of the obligee in his suit against them. If A. is bound to B. in an obligation, and they enter into a covenant, stipulating that it shall never be put in suit, notwithstanding which B. puts it in suit, this breach of covenant gives A. an action against B. in which he must recover in damages, precisely the sum to' which the judgment obtained by B. may amount. To avoid circuity of action, this covenant may be pleaded as a release.
Thus far the cases go ; and if there be one which goes farther, I have not found it. To Dring himself within their letter, Brooke ought to show a covenant, in which Campbell stipulates with Aylett and himself, never to put their bond in suit. To bring himself within their spirit, he ought, to show some agreement giving him an action against Campbell, in which his right would be commensurate with any judgment Campbell might obtain against, him. In such a case, and in such a case only, would the principle of the decisions relied on apply; because, in such a case only, the sole effect of leaving the instrument to operate according to *its language, would be to produce circuity of action. In such a case too, the parties can have no other intention than to defeat the obligation. It is the sole object and effect of their covenant. To construe such an instrument then, as a release, is to give it the effect intended by the parties.
I think the proposition may be stated, without fear of its being disproved by the books, that a covenant containing no words of release, has never been construed as a release, unless it gave to the party claiming that construction, a right of action, which would precisely countervail that to which he was liable; and unless also, it was the intention of the parties, that the last instrument, should defeat the first.
This general view of the precedents on which the plaintiff relies, would be sufficient to satisfy my mind, that they do not apply to the case under consideration, had not the contrary opinion been urged at bar, with all the earnestness of conviction, and been supported by an authority, given on the case itself, which is entitled to the utmost respect.
I-shall, therefore, look farther into the question, and examine some cases and principles, *1177 which are adverse to the construction claimed by the plaintiffs’ counsel.
Lacy v. Kynaston, (2 Salk. 575; 12 Mod. 551;) [2 Ld. Raym. 688,] was in substance this : Articles were entered into by the members of a company of comedians, binding' themselves, to pay one hundred pounds, to the representative.of the plaintiff’s intestate, who was a member of the company, within three months after his death, should he continue to act during" his life. The action was brought against Kynaston, who was also a member of the company, and the declaration avers, that plaintiff’s intestate did continue to act during his life. The defendant pleads in bar, articles subsequently entered into by the same parties, including the plaintiff’s intestate, stipulating jointly and severally, that if the defendant Kynaston, should give notice of his intent to give over acting in said companies, he should be free and discharged of and from all debts, &c. entered into by him on account of the company, and that the plain- . tiff’s * intestate, and the rest, should save harmless and indemnify the defendant, from all such debts, &c. or any matter or thing relating to the company. To this plea, the plaintiff demurred, and the only question was, whether the articles amounted in law to a defeasance or release, or were to he construed only as a covenant. The court was of opinion, that it was only a covenant, for several reasons, which are assigned in the opinion. In discussing the question, the principle, that a perpetual covenant amounts to a release, was particularly considered, and the reason given for construing such a covenant as a release, is to avoid circuity of action, “Because,” says the court, “there, one .should precisely recover the same damage that he had suffered by the others suing the bond. A. is bound to B. and B. covenants never to put the bond in suit against A., if after B. will sue A. upon the bond, he may plead the covenant, by way of release. But if A. and B. be jointly and severally bound to C. in a sum certain ; and C. covenant's with A. not to sue him, that shall not be a- release, but a covenant only ; because he covenants only, not t.o sue A., but does not covenant not to sue B., for the covenant is not a release in its nature, but only by construction, to avoid circuity of action ; for when he covenants not to sue one, he still has a remedy, and then it shall be construed as a covenant, and no more.” The same point was determined in Dean v. Newhall, (8 T. R. 168,) in which the authorities were reviewed at length, and a distinction of great importance taken, between an actual, and a constructive release.
It has been insisted by the plaintiffs’ counsel, that these cases do not apply, because they relate to obligations which were joint and several ; whereas, the obligation of Aylett and Brooke was joint.
This objection merits consideration.
It is admitted to be law, that a release to one of several obligors, whether they be bound jointly, or jointly and severally, discharges the others, and may be pleaded in bar, by all. (2 Saund. [48 a] note ; 2 Salk. 574; 12 Mod. 5S0.) *That the obligation is joint, or joint and several, then, can make no difference, if there be an actual release. The difference, if there be any, consists in the construction of the instrument. The same words, it may be contended, would amount to a release of a joint obligation, which would not release one which was joint and several.
Has this ever been so determined ? I can only say, if it has, I have not found the case. In the absence of authority, the proposition must rest upon its reasonableness, and on analogy.
The reason assigned by the plaintiff in support of this distinction, is that which is given by the court in Lacy v. Kynaston. In case of an obligation which is several as well as joint, the plaintiff may still sue the obligor, to whom the covenant does not apply, without violating his engagement, or subjecting himself to a suit; whereas, if the obligation be joint only, both obligors must be joined in the action. There is certainly much in this argument which deserves consideration. Without admitting its conclusiveness, which I am far from doing, it is necessary, as an indispensable preliminary to its application to the cause at bar, to show that the endorsement on the bond of'Aylett and Brooke, amounts to an agreement on the part of Campbell, not to sue Aylett, on which agreement Aylett might recover damages equivalént to those he had sustained by the suit.
I do not think this is shown. Aylett is no party to the endorsement, and it is only upon the'intention, that Campbell can be considered as coming under any stipulation to hirn. What,'then, was his intention? Certainly not to discharge the" obligation. The endorsement supposes the obligation td remain in full force, and is received in the confidence,'that it does remain in force. It may well be doubted, whether a destruction of the obligation would not also destroy the endorsement; for, Page agrees only to stand in the place of Aylett, in the obligation, and if that he annulled, it is by no means clear, that Page is bound to any thing. *Were this even otherwise, it is very certain, that Page would be placed in a situation entirely different from what he intended. If the endorsement is to be considered as a substantive agreement, referring to the obligation, for the sole purpose of ascertaining the sum for which he was bound, and remaining in force after the destruction of that obligation, then Page would be liable to Campbell for the whole debt, without retaining that recourse against Brooke for a moiety of it, which Aylett certainly possessed. He would not then stand in the room of colonel Aylett, as the endorsement imports, but in the room of both Aylett and Brooke, which the endorsement does not import. To construe Campbell’s assent to this endorsement, then, as an agreement not to sue Aylett, if the effect of that agreement would be to destroy the obligation, would be to defeat the plain intention of the parties, and effect an object they designed' to guard against. This is not to be tolerated, if the act can be otherwise construed. I can perceive no difficulty in doing so. The intention of the endorsement, being to secure col. Aylett, against the claim of William Campbell, and to transfer his liability to Mr. Page, leav *1178 ing- Mr. Brooke still bound, the endorsement must be so construed, as to give full effect to the whole of this intention, so far as its words will justify. Now, if by supposing an agreement on the part of Campbell not to sue Aylett, we plainly defeat the intention of the parties, and probably annul the instrument itself, we ought not to suppose such an agreement, but some other more congenial to their views. Their object would be effected by joining Aylett in the suit on the obligation, and either not proceeding to judgment against him, or not using the judgment when obtained. If it were true, that the suit could never be brought against Brooke without joining Aylett, in the writ, it would be much more rational to suppose that an agreement for his -security, omitting to describe the mode by which it was to be effected, was to be carried into execution by means consistent with other objects plainly intended by the parties, than by means which must defeat those objects.
*The respect which the law, in all such cases, pays to the intention with which an instrument is executed, may receive some illustration from the difference between the construction of a perpetual and of a temporary covenant, not to put a bond in suit. Precisely the same words, which, in a perpetual covenant, is a bar to an action, cannot, if used in a temporary covenant, be pleaded to an action brought during the suspension. Why is this? If the perpetual covenant can bar the action forever, why may not the temporary covenant be pleaded to an action brought while the suspension exists? The reason of the distinction, is found in the principle, that a personal action once suspended, is gone forever. Although, therefore, it is the intention of the parties to suspend the action, and although this intention is expressed by their words; yet, as the consequence of giving effect to this intention would be to destroy another more important object;— the validity of an instrument not designed to be destroyed, — such a covenant is not allowed to constitute, even a temporary bar, but the party injured by its breach, must take his remedy- by a cross action upon it.
On general principles, then, I should, in the absence of express authority, be led to the conclusion, that a covenant with one of several joint obligors not to sue him, could not be pleaded as a release. But the very case, has, I think, been decided.
In Hutton v. Byre, (1 Marshall, 603, [6 Taunt. 289,]) which was cited by Mr. Call, the action was brought for money paid to the use of the defendant. The plaintiff and defendant being partners, entered into a deed on the 26th August, 1809, to dissolve their partnership on the 1st of January, 1810; and agreed that neither would in the mean time, contract any debt on the credit of the firm. On the 27th of October, 1810, the defendant executed an assignment of all his property to trustees, for the benefit of his creditors; in consideration of which, the creditors covenanted and agreed with the defendant, not to sue him, on account of any debt due to them from him; and that in case they Mid sue him, the deed of assignment should be a sufficient release and discharge for him. The trustees sold the property assigned to them, and paid five shillings in the pound, to the creditors, after which, the plaintiff paid the residue of certain debts contracted by the defendant between the date of the agreement and the time of dissolution, on the credit of the firm, for which this suit was brought. It was contended for the defendant, that the covenant not to sue him, being perpetual, was a release, not only to him, but to his partner also; and that the payment, being voluntary, gave no cause of action.
It is observable, that this case, is stronger than that under consideration would be, did the endorsement made by Page, on the bond of Aylett and Brooke, even contain a stipulation that no suit should be brought against Aylett, because, the instrument provides expressly, that in case suit should be brought, the deed of assignment should be a sufficient release and discharge.
In delivering the opinion of the court, lord chief justice Gibbs, noticed the cases of Lacy v. Kynaston, and Dean v. Newhall; but observing the circumstance, that those cases were on joint and several obligations, and were, therefore, not direct authority for the case before the court, he added, “we must look at the principle on which the rule has been applied, that a covenant not to sue, shall operate as a release. Now, where there is only A. on one side, and B. on the other, the intention of the covenant by A. not to sue B. must be taken to mean a release to B. who is accordingly, absolutely -discharged from the debt, which A. undertakes never to put in suit against him. The application,. therefore, of the principle, in that case, not only acts in prevention of the circuity of action, but, falls in with the clear intention of the parties. But in a case like the present, it is impossible to contend that, by a covenant not to sue the defendant, it was the intention of the covenantors, to release the plaintiff, who was able to pay what his partner might be deficient in. It would have been an easier and a shorter ^method to have given a release, than to make this covenant. The only reason, therefore, for their adopting this course, was, that they did not choose to execute a release to the defendant, because, that would also, have operated as a release to the plaintiff; whereas they considered that a bare covenant not to sue the defendant, would not extend to his partner. As, therefore, the terms of the covenant do not require such a construction, and as such construction would be manifestly against the intention of the parties, we are decidedly of opinion, that it ought not to be permitted so to operate.”
I can add nothing to the language of chief justice Gibbs, to show farther the direct application of this case to that under the consideration of the court. That this, was not a joint obligation, but a joint as-sumpsit, constitutes, I think, no difference in the cases.
In considering a principle of construction, which rests entirely on a technical and positive rule, as defeating a plain in *1179 tention, it may not be altogether improper to consider the action oí other technical principles on the case.
It is clear, that if this endorsement be construed as an agreement between Campbell and Page, who is a stranger to the bond, if cannot release Brooke, the obligor. This is expressly stated by the court in the case of Lacy v. Kynaston. But if it be considered as an agreement between Campbell and Aylett, still, it is an agreement by parol only, and an agreement by parol, cannot release an instrument of writing under seal. This subject is discussed in 2 Saunders, 47, in a note of Mr. Williams. Brooke, does not alledge satisfaction of the contract, but a discharge from it. He does not alledge performance, but that he is not bound to perform. The instrument which will sustain such a defence, must be of equal dignity, with that which it professes to dissolve.
According to the best view I can take of the question, I cannot consider the endorsement made by Page on the bond of Aylett and Brooke, as implying any agreement on the*part of Campbell, which could be used by Brooke, in law or equity, as a release.
The next objection to Campbell’s claim is, that the estate of Robert Page, ought to be exhausted, before recourse is had to Brooke; because in June 1792, Braxton mortgaged sundry slaves to Page and White, to indemnify Page, on account of this suretyship, and White, for suretyships entered into by him. Braxton was after-wards taken in execution at the suit of Richard Adams, upon which, Page and White agreed that a sufficient portion of the mortgaged propertj’, should be sold to discharge the execution. It is contended on the part of Brooke, that he has an eqijal interest with Page, in this mortgage, that it was the duty of Page, to see to its application to the discharge of the debt, for which they were both bound, and that he is liable, first, for his negligence in allowing the property to he wasted; and secondly, for having allowed a part of it to be applied to a different object.
As Campbell was not party or privy to this transaction, it can give Brooke no claim on Campbell, were it even admitted to give him an equity against Page. It is undoubtedly the course of the court, to decree in the first instance against the party who is tiltimately responsible; but this is only done, where the parties are before the court, at the time of the decree, and their several liabilities, are clearly ascertained. It would be alike unprecendented and unreasonable, to anticipate, in this action, the liability of Page to Brooke, for a transaction not before the court; and to compel Campbell to resort to that liability, and to forego his direct claim on his immediate debtor, and that without any proof of the competency of Page’s estate, to satisfy the unascertained equity of Brooke. The unreasonableness of such a pretension seems so obvious, that I presume it is brought forward only on account of its connexion with a subsequent transaction between Page and Campbell.
On the 6th of June, 1821, articles of agreement were entered into between the representatives of Page, and the ’'attorney in fact, of Campbell, in which, Campbell agrees in consideration of one moiety of the whole debt paid by Page’s representatives, not to proceed against them, for satisfaction of any part of the decree which might be obtained against the representatives of Page and Brooke; but this agreement is to be without prejudice to his right to pursue the other defendants, till the other moiety of the debt should be satisfied, “and the said Campbell farther covenants, that the representatives of Page, shall never be made to contribute any thing to the estate of George Brooke, on account of any payment, the said Brooke’s estate may be decreed to make to the said Campbell.”
This agreement, not to levy the decree, which might be obtained against the representatives of Brooke and Page, upon the estate of Page, which had already paid one motiey of the whole debt, is in terms, which exclude the idea of being technically a release of the action, for that is to proceed, as if the agreement had not been made. The representatives of Brooke, can avail themselves of it so far only, as it raises an equity in their favour, against Campbell. What is this equity? It cannot be contended, that receiving one moiety of the debt from Page, is an injury to Brooke; ex parte, Gifford, (6 Vesey, jun. 805;) nor can he be injured by the agreement, not to levy Brooke’s moiety, in any possible state of things, on Page. The liability of Brooke cannot be increased, nor his burthen augmented' by this transaction. It may be diminished, because his possible liability for more than a moiety of the debt, is removed. Can the covenant that the representatives of Page shall never be made to contribute any thing to the estate of George Brooke on account of any payment the said Brooke’s estate may be decreed to make to the said Campbell, give Brooke an equity against Campbell?
To sustain this, it will be necessary to prove, that the estate of Brooke has an equity against that of Page, and that it is deprived of that equity, by this agreement. The amount of this injury, is the precise extent of Brooke’s claim upon Campbell.
*Brooke’s equity against Page, is founded on the agreement that a part of the property mortgaged to White and Page, might be applied in payment of the debt due from Braxton to Adams, and on the failure of Page to apply the mortgaged property to Campbell’s debt.
This mortgage was obtained for the benefit of Page and White, in proportion to their respective responsibilities, and it will not, I presume, be denied, that they are to be completely exonerated, before any equitable claim on the fund, can accrue to Brooke. How far Mr. White may have been relieved, does not appear, nor is it shewn that one cent arising from this property, has ever been applied to the use of Mr. Page. Admitting him to be responsible for the sum paid to Adams, his responsibility can be only for the excess of that sum, over the debts the mortgage was in *1180 tended to secure, and Brooke ought to show that excess. Its existence is not, and cannot be pretended.
As little foundation is there for. the claim growing out of the alledged negligence of Page.
It will scarcely be pretended, that one of two sureties who obtains an indemnity for himself, becomes thereby responsible to the other, for that other’s moiety of the debt, however insufficient the thing given as an indemnitj . may be, even to secure himself. If this cannot be pretended, it will certainly be required from the person who claims the residue, to show, that there was a residue, and that it has been lost to him, by the fault- of the party whose responsibility he alledges. His difficulties would not, even then,, be overcome. The enquiry would still.be, why did he not himself proceed to-assert his equity, by calling on the mortgagee and mortgagor to apply the fund to its proper object, and thereby relieve him to the extent.of his right. But I enter not into this enquiry, because the subject is not, and probably never-will be,, before.the court. It is enough to say, that this equity cannot be assumed in this suit, to the discharge of Brooke’s debt to Campbell.
*1 will barely add, to . prevent my being, understood as deciding . any thing, .which might affect, a , point, ■ not strictly before.the court, that I do not mean to indicate any opinion whether the . con-, tract between Campbell and Page, could or could not, .influence any claim of Brooke on Page, growing out of the conduct of Page respecting the mortgage .of 1792. In deciding on the right of the plaintiff to.demand a specific performance of his contract with Macon, that question must be considered as remaining open.
An additional, objection to Campbell’s claim on the Mantapike, estate, is derived from the length of- time which has elapsed, since the decree, by which his debt was established.
The decree of affirmance, was entered on the 3d of March, 1800, in the court of chancery; and on the 29th of September, in the same year, all attempts to find the mortgaged propertj’ having- failed, executions were directed by the court to issue against the estate of Brooke and Page, respectively, in the hands of their respective representatives, who, on the 18th of March, 1801, were ordered to settle their several accounts of administration, before a commissioner of the court. Prom that time, till the 27th of October, 1820, when the supplemental bill was filed, no step whatever has been taken, against Brooke’s estate. • By this gross negligence, the plaintiff alledges, .that his testator has been greatly injured, if Campbell be now permitted to charge his debt upon Mantapike.
There is, undoubtedly, great weight in this objection; but, the extent of its influence on Campbell’s claim,, depends on circumstances, the testimony concerning which, is not to be found in the record, before the court. It will form a very material part -of the case, in which,,Keith.is plaintiff. That case, being, not ripe for a hearing, the, claim of Campbell upon Mantapike, even while it remained in the hands of the devise, must, for the present, be considered as uncertain. Previous to any discussion of the effect of such a claim, on this contract, the court will proceed to the second point made by the plaintiff, in the argument, which is, that
^Second. If Campbell’s is one of George Brooke’s just debts, and is chargeable on his lands, still, it cannot charge Mantapike, in the hands of William H. Macon.
In considering this point, I shall assume for the present two propositions:
1st. Had Keith’s suit, praying a sale of Mantapike for Campbell’s debt, been instituted before the contract between Garnett and Macon, was entered into, the subsequent sale, made by the, executor, without the assent of the court or creditor, could not have relieved the land from the charge created- by George Brooke’s will.
2nd. Had the conveyance been made, and the purchase money been paid, before notice of the claim, the purchaser would not have been affected by it.
It is unquestionably true, that, whatever doubts m.ay exist, respecting the liability of a purchaser, for the application of ' the purchase mone3, to schedule debts, with which lands are'charged, he is exempt from all liability for its application to debts generally. Had the contract, then, been' fully .executed before this claim was asserted, Mantapike would have been clearly exonerated from it. .
. These propositions are stated, for the purpose of clearing the way, to thé very case before the court; the case of a contract for the purchase of land, equitably charged with the payment of debts, and' notice' of a debt given to the purchaser between the date of the contract, and thé time when it is to be executed.
In considering this case, the question immediately occurs, whether there is any distinction between a charge on lands, which descend to the heir, or pass to a de-visee,, subject to the chargeand a devise to executors or other trustees, for the payment of debts.
In Moseley 96, [anonymous,] and in Nelson’s Ch. Rep. 36, this question was answered in the affirmative by the court; and it was determined, that where lands were charged with debts generally, they remained liable to .creditors in the hands of a purchaser. This distinction was, however, overruled *in the case of Elliot v. Merryman, (Barnard, Ch. R. 78, 81-82,) in which the master of the rolls determined, that in such a case the purchaser was not liable for the application of the purchase money, and said that, “otherwise, whenever lands are charged with the payment of. debts generally, they could never be discharged without a suit in chancery, which would be extremely inconvenient.”
There were many circumstances in the case of Elliot v. Merryman, showing, that the . creditors acquiesced in the sales, arid looked to. the vendor for their money, which might have had great influence on the mind of the judge; and, if that case stood alone, ■the question might not be considered as settled... But it does not stand alone. The *1181 principle laid down by the master of the rolls, appears to have been followed ever since; and in Walker v. Smalwood, (Amb. 676,) which was a charge on land for debts generally, the chancellor said, ‘‘the court has established it as a rule, that where the charge is general, the purchaser is not bound to see to the application of the purchase money.” This rule has been pursued invariably in the English courts for near a century, and may, therefore, be considered as well settled. Although the charge creates no legal estate, it manifests a clear intent that the person in whose favour it is made, shall receive so much out of the land, which a court of equity considers as a trust, and converts the owner of the legal estate, into a trustee. The heir or devisee, being once considered as a trustee, and the charge considered as a trust, public convenience and uniformity of decision would lead to an assimilation of these charges, or implied trusts, to those which are express; and, in general, where no other question arises, than what relates to the construction of the trust, and the respective duties it imposes on a vendor and vendee, in' a case attended with no peculiar circumstances, a court of equity perceives no ground of distinction between them. But, if it be admitted as a principle, that in a case of direct and culpable, or of negligent and constructive collusion between the vendor and vendee, by which the trust may be *defeated, the purchaser may become responsible for the application of the purchase money; or, in other words, the land may remain charged in his hands; it is possible that there may be a difference in the testimony required to establish this constructive collusion, in the one case, and in the other.
If lands be devised to trustees or executors, to be sold for the payment of debts, the devisee possesses a legal, but not a beneficial estate in the premises. He can sell for the purposes of the trust only; and the vendee can consider him as acting no otherwise, than in the execution of a trust for which he has been selected by the owner of the property. This confidence being placed in him, by the person who had the sole right to dispose of the property, at his will, no other can question the correctness of his proceeding, or can be justifiable in suspecting any intention to violate the trust. The payment of the purchase money, therefore, to the trustee, is an act, which is the regular consequence of the contract; and, if that be made fairly, the purchaser has no right to enquire in what manner the residue of the trust will be executed. He has no right to suspect that the person who has been selected by the testator, for its execution, will violate the trust reposed in him, and no collusion between him and the trustee, ought to be implied from equivocal acts. The existence of a debt, is the very circumstance which justifies a sale, and notice of its existence, can never excuse the purchaser for withholding the payment of the purchase money.
But where lands descend to the heir, or pass to the devisee, he does not necessarily sell, in execution of the trust, but for his own purposes. The trust is, in a great measure, the creature of a court of equity; and the heir, or devisee, is made a trustee by the court. When he sells, he is not executing a power confided to him for the purpose of paying debts, but is parting with an interest vested in himself, for his own use, which interest is charged with debts. The purchaser does not consider the seller as executing a trust, *nor does he so consider himself; but each considers him as acting for his own benefit. If in such a case, the charge still remains unsatisfied, the purchaser, who has notice of it, may be considered as aiding in, and conniving at, a violation of the trust, under circumstances which would not justify the same conclusion,if the trustee professed to act in the execution of his trust.
It becomes, therefore, material to enquire, what degree of connivance on the part of the purchaser, in acts which may defeat the trust, will leave him responsible to the creditor.
It is scarcely necessarj to say, that positive fraud, or direct collusion, for the purpose of defeating the trust, will charge the purchaser. It is unnecessary to urge this proposition, because the principle is, I believe, conceded by all, and because too, the transaction before the court, has no taint of that description. Its moral iairness is not questioned; and the sole enquiry is, whether the purchaser by proceeding with the contract, and paying the' purchase money, would have exposed himself to the hazard of such a constructive collusion as to leave him subject to the claim of the creditor.
In pursuing this enquiry, it is proper to recollect, that Mantapike, was devised by George Brooke, to his son Richard, charged with the payment of his debts. This devise gave Richard, an absolute estate at law, subject to an equity, which could be asserted only in a court of char eery. Richard Brooke, would be considered, in this court, as a trustee for the creditors of his father, and had they applied to a court of equity, a sale of the property would, if necessary, have been decreed. Richard, survived his father, upwards of thirty years, during which time, no claim was asserted on Mantapike; and in his last will, devised his estate to be sold, and the money divided among his children. One clause is supposed to charge his real, as well as personal estate, with his debts.
Although a court of equity, will consider the trust with which Mantapike was chargeable in the hands of Richard, as passing with the land, to his devisee, yet the devisee *might naturally consider himself as acting under the express trust, contained in the will of his immediate testator. The purpose of his sale, would be, to comply with the will of Richard, and any presumption, that he might possibly hold himself bound to pay the debts of George, is prevented, so far as respects Campbell’s claim, by the fact, that he denied all liability for that claim. If the purchaser should, after receiving notice of that claim, proceed to pay the purchase money to the seller, who contested its validity, and did not hold himself responsible for *1182 it, the question arises, whether payment under such circumstances, might not be considered in a court of equity, as so far implicating the purchaser in an act tending to defeat the trust, as to charge him, in the event of a failure on the part of the trustee, with the amount of' the debt, so far as the purchase money was liable for it. With full notice of the claim, he pays the money to a person, who receives it, not for the avowed purpose of applying it to the objects of the trust, but of applying it to distinct trusts created by the will of which he is executor.
This state of things, presents a case entitled to very serious consideration.
It is an old rule, that all persons acquiring property bound by a trust, with notice, shall be considered as trustees. The ancient cases on this point, are collected in Equity Cases Abridged, under the title Notice; and the modern decisions, maintain the principle. The purchaser is subject to all the consequences of notice, if he receives it before payment of the purchase money. In one case, Wigg v. Wigg, (1 Atk. 382, 384,) this rule has been carried so far as to affect the purchaser who had paid his purchase money, but had not received his conveyance. Whatever may be thought of the rule, as applying generally to cases of this description, it has, I believe, never been doubted, that notice after the contract, and before the payment of the purchase money, made the purchaser a trustee.
That the charge created by the clause in George Brooke’s will, which subjects his lands to the payment of his debts, *is a trust in the view of a court of equity, . is admitted, and the purchaser, with notice, must take the land' clothed with that trust, unless he can bring himself within the principle, that he is not bound to see to the application of the purchase money.
I have, certainly, no disposition to contract this principle within narrower limits than have been heretofore assigned to it. On the contrary, I am strongly inclined to the opinion that,- if the instrument by which the trust is created, contains no provision contradicting the presumption,- that the person who is to make the sale, is also to execute the trust throughout, it will be found difficult to-maintain the dicta which are scattered thick through the books, 'declaring the purchaser bound to see to the application of the purchase money, in cases of scheduled debts, or legacies. The principle, . however; which supports this' opinion, must be examined, to détermine how far it will carry us. The person creating the trust, has confided its execution to the trustee, where he has named one; and it is a part of his duty to sell the trust property, and, generally, to receive the purchase money, and- dispose of it for the purposes of the trust. The trust could not be executed without a sale, and sales would be very much embarrassed, if the purchaser, by the mere act of purchase, became a trustee. In all cases, ■ therefore, whether the objects are not so defined, as to be brought at once, . to the view of the purchaser, -it is settled, that he is not affected by them; and -has only to pay the 'purchase money. The same rule is established in the case of a charge, where the lands descend, or are devised, liable to the payment of debts. In such case, a court of equity considers the heir, or devisee, as a trustee, and exercises the same control over him, as over a trustee named by a testator.
In either case, if there be nothing to show that the trustee is acting in violation of his trust, the purchaser must consider him, as acting in pursuance of it; and as the sale may be a necessary part of it, the purchaser has done every thing incumbent on him, when he pays the purchase ' money, and *is, consequently, relieved from the necessity of enquir-ing into the conduct of the trustee.
But trusts, whether express or implied, are the peculiar objects of care to courts of equity, and are guarded from abuse, with great vigilance. In the exercise of this vigilance, they extend their control, not only over the trustees themselves, but over all those who have transactions with the trustees. Their endeavours to secure the faithful execution of trusts, would often be defeated, if their regulations could not comprehend 'and bind those who contract for the trust property. To prevent the abuse of trust by the trustee, it is necessary to annul his acts, so far as they constitute an abuse; or, in other words, to consider the property in the hands of a purchaser, who has aided in the abuse, as still charged with the trust. In affirmance of this principle, the master of the rolls, said, in a late case, [Balfour v. Welland,] (16 Ves. jun. 156,) “Where the act is a breach of duty in the trustee, it is very fit, that those who deal with him should be- affected by an act, tending to defeat the trust, of which they have notice.”
■ Plain as this principle is, and strictly conformable as it is to the general doctrines of a court of equity, there is some difficulty in applying it to particular cases. It is not easy to mark the precise act, which constitutes such a breach of duty in the trustee, as will affect the purchaser. If William Garnett be considered in this court as a trustee for the execution of George Brooke’s will, by the sale of'Mantapike, it would defeat the trust, to sell that estate for the uses described in Richard Brooke’s will, unless the debts of George Brooke', are to be considered as the debts of Richard Brooke, provided for by'that clause in his will, which respects his own debt's: And if William Garnett; sold with the avowed purpose, of excluding the debts of George Brooke, or if he should proceed to distribute the money according to the will of Richard Brooke, disregarding the claims of George Brooke’s creditors, if there be any, the trust, so far as respected those claims, would be defeated; *and a purchaser intending to aid in thus ' defeating the trust, could not be perfectly secure. But if William Garnett sold with the intention of paying George Brooke’s creditors first, and then of • distributing the residue of the money according to the will of Richard Brooke, the act of the sale would be no breach of trust, since a sale would be necessary for its performance. A pur-' chaser, therefore, of the Mantapike estate *1183 might be placed in some peril. After receiving notice from a creditor of George Brooke, he might be considered, if he proceeded with the contract, as taking upon himself a responsibility for the subsequent transactions of William Garnett, which was no part of his engagement, and which he did not mean to take.
I very readily admit, that if a trustee sells for the payment of debts generally, he is at liberty to contest any particular debt, and no notice to the purchaser can involve him in the contest. But, in such case, the trustee is in the fair execution of his trust, and regular performance of his duty; and the purchaser, having no right to intrude himself into the trust, can not be made responsible for its execution. But if the trustee, not professing to sell under the trust, holds himself absolved from it, and this is made known to the purchaser, the question, whether by completing the purchase, he assists in defeating the trust, and will be held responsible in a court of equity, becomes a much more serious enquiry. In pursuing it, all the circumstances must be considered, in order to determine, whether they prove satisfactorily, that the trustee is not acting in pursuance of the trust, but under the opinion that it does not bind him.
In this case, William Garnett is the immediate trustee of Richard Brooke, charged with the execution of his will, which directs the sale of Mantapike for the benefit of his children, and probably for the payment of his own debts. Although a court of equity will consider the land as charged with any debt due from George Brooke, and treat the devisee of Richard Brooke, as a trustee for such creditor; yet the devisee would assume a verj' great responsibility, *were he to undertake to pay this debt, without the direction of a court. If the existence of the debt might be presumed, of which great doubts have been suggested at the bar, the extent of his testator’s liability for it, is far from being certain. The personal estate of George Brooke ought to have been exhausted, before his real estate became chargeable, and the proportion of the debt with which Man-tapike ought, under all circumstances, to be charged, could not safely be settled by the executor. ¡No counsel could have advised William Garnett, to incur this responsibility. JSTo court could censure him for not incurring it. William H. Macon, then, who purchased without suspicion that any creditor of George Brooke remained unsatisfied, had great reason for the apprehension, that Mr. Garnett not considering himself, as a trustee for the benefit of-such creditor, would apply the money to the uses prescribed in the will of Richard Brooke. This apprehension could not be removed by any enquiry. The bill filed by William Garnett, to enforce a specific performance, alleges expressly, that Campbell’s debt was not due from George Brooke, and that if it was, Mantapike is not charged with it. Whether any direct communication took place between the parties on the subject, is unknown; but as none is stated, none can be presumed. The fact, however, is sufficiently obvious, that any enquiry respecting it, must have been answered, by the 'assurance, that the justice of the claim was denied. Whether going on to complete the contract, by paying the purchase money, under these circumstances, would be considered by a court of equity, as such a concurrence in “an act tending to defeat the trust” as would affect the purchaser, is a question of real difficulty. Some light may be thrown upon it by analogies drawn from the liability of the purchaser of leasehold estates. It is well settled, that the purchaser of a chattel from an executor, is not liable for the application of the purchase money, although such chattel be given in trust for a special purpose, or be itself a specific legacy. [Elliot v. Merryman,] (Barnard, Ch. R. 78, 81, [2 Atk. 42;]) *[Ewer v. Corbet,] (2 P. Wms. 148;) [Burting v. Stonard,] (2 P. Wms. 150). The reason is that no man can exempt his personal estate from the payment of his debts, or make any disposition of it, which shall prevent its passing to his executors, to be sold by them, if his debts require it. Consequently, whenever an executor sells, in execution of his trust, the purchaser takes the property, freed from any charge with which the testator may have burthened it by his will. But if the sale be a breach of trust, and the purchaser have notice of the fact, he is affected by it. If the executor sells to a person who knows that there are no debts, or that all the debts are paid, and that the sale is not a fair execution of the trust, the purchaser may take the property, subject to the trust. (2 P. Wms. 148, 150.) So too, if the executor sells at such under value, as to indicate fraud; or for payment of his own debt. [Crane v. Drake, et al. ;] (2 Vern. 616, Ed. Raithby;) [Scott v. Tyler,] (2 Bro. C. C. 433, 477;) [Andrew v. Wrigley,] (4 Bro. C. C. 125, 130;) [Hill v. Simpson,] (7 Ves. jun. 152, 167;) [Lowther v. Ld. Lowther,] (13 Ves. jun. 95;) [M’Leod v. Drummond,] (17 Ves. jun. 169).
These cases proceed upon the principle, that the executor does not sell in pursuance of his trust, but in violation of it; and, that the purchaser, knowing this fact, aids him in its execution by making the contract. The purchaser is not bound to make any enquiry. The general power of the executor to sell, protects him in buying; but if he buys with notice, that the sale is a breach of trust, the property remains charged with it.
I feel much difficulty in resisting the application of this principle, to freehold estates charged with the' payment of debts. It would seem to me, as if the enquiry must always be into the fact. The question must always be, Is the sale, taking its object into view, a breach of trust? And are the circumstances such as to charge a purchaser, having express notice, with a participation in the breach? The purchaser of a Chattel, from an executor, with notice) that no debts are *due, or in payment of his own debt, seems to me to present the same question.
Two cases have been cited by the counsel for the plaintiff, as bearing very strongly on that, under consideration of *1184 the coart. The first is, Walker v. Smal-wood, (Afflb. 676). John Smalwood devised his estate to his son Thomas, charged with the payment of debt; and Thomas, afterwards, mortgaged the estate, and then devised it to his wife, charged with the payment of his debts. The bill was brought by bond creditors of John and Thomas Smalwood, against the wife, and mortgagee. Pending the suit, they joined in selling the land to Yeomans, against whom, a supplemental bill was filed, to set aside the sale. It was set aside, upon the principle, that the execution of the trust had been taken out of the hands of the trustee, and transferred to the court.' The chancellor said, “Though a general charge does not make a purchaser before the suit see to the application of the money, yet after a suit commenced, I should hold him bound to it: and I hold it as a general rule, that an alienation pending a suit is void.” He also states, that actual notice was admitted.
The propositions stated by lord Camden, in this case, have not, I believe, been questioned, but those propositions do not reach the point now in controversy. A part of the purchase money was applied to the mortgage made by Thomas Smalwood, and the case does not inform us, that any objection was made on this account; but the case does not inform us either, whether this mortgage was made in satisfaction of a private debt due from Thomas, or for money generally, which might have been applied to the debts of the father, or for a debt actually due by the father. Notice was admitted, but of what? Probably, of the application of the money, and of the pen-dencj of the suit. But these facts, do not imply a breach of trust, since it is not shown that the mortgage itself, which is an alienation pro tanto, was made under circumstances, which could involve the mortgagee in the application of the money. This case then, has no positive application to that at bar.
^The other case is, Hardwick v. Mynd, (1 Anstr. 109.) William Mynd, devised considerable estates to his son William Mynd, charged with certain legacies to his daughters. He also devised other estates to George Mynd and John Roberts, in trust for payment of debts, and appointed them his executors. George Mynd and John Roberts renounced the executorship, and conveyed their interest in the freehold estates to William, the son, subject to the trusts of the will. William, mortgaged great part of the estate for his own debts; and, about eleven years after the death of his father, became a bankrupt.
The creditors of the father, then filed this bill for the satisfaction of their demands; and it was admitted, that the most considerable of the mortgagees took, with notice of the situation of the property.
Byre, chief baron, said, (and it is to be presumed the court concurred with him) — ■ “If the trustees had made these mortgages, they would not have been disturbed; in fact they are made by them ; for they have assigned their whole interest to William Mynd to act for them in the trust.”
If the case stopped with this opinion, it | would be, perhaps, conclusive, certainly very strong, in favour of the plaintiff. The mortgagees took with notice of the misapplication of the purchase money, and were yet not held responsible for that misapplication. This decision would certainly go far in showing, that a purchaser, knowing that the sale was made not for the purposes of the trust, but of the trustee, would yet hold the land discharged from the trust. But other points were determined which deduct considerably from the application of this opinion to the case at bar, if they do not entirely destroy it. The court held the trustees liable to make good the whole deficiency arising from the misapplication of the fund.
This case then, considering the two points which were decided in connexion with each other, amounts to nothing more than this. Where there has been a collusion between the trustee and purchaser, which results in an abuse of the *trust, the trustee shall be chargeable in the first instance; but the case does not decide, on the ultimate responsibility of the purchaser, should the trustee prove insolvent. Applying it to the case at bar, it would prove, that had William H. Macon, proceeded, after notice, to complete the contract, and to pay the purchase money: and a suit been brought by the creditors of George Brooke, Williams Garnett, would have been liable in the first instance; but does not, I think, prove that William H. Macon, would not have been liable, in the event of the trustee’s insolvency. The court professed to found its opinion on the case of Burt v. Dennet, (2 Bro. C. C. 225.)
Dennet, was trustee in a mortgage deed from Godfrey to Burtenshaw, by which an annuity of ¿30 per annum, was secured to the plaintiff. Dennet, having transactions with Burtenshaw, assigned the mortgage to him, without the privity of the plaintiff; and afterwards assigned his property to trustees for payment of his debts. Burten-shaw paid the annuity to the year 1784, after which he stopped the payments, upon which the plaintiff filed her bill against Dennet. The chancellor said, “the plaintiff ought to have made Burtenshaw and the assignees of Dennet’s estate parties, by which she might have gotten the mortgage deeds: he then should have decreed Burten-shaw to have paid the annuity, and Den-net to stand as a security, for having broken the trust.”
This case is not supposed to be applicable to that at bar, for the assignee of the mortgage, was undoubtedly responsible for the annuity. It is cited solely, because it was referred to by the court, as an authority for the opinion given in Hardwick v. Mynd, and ma3, therefore, tend to explain that opinion. It would countenance the idea, that in the case in which it was cited, the court did not suppose that the liability of the original trustee discharged the as-signee.
Taking together the two parts of the opinion given in Hardwick v. Mynd, I cannot consider them as showing what would have been' the decision of the court, with respect *to the mortgagees, had the trustees been insolvent. The *1185 report is very unsatisfactory, in as much as it assigns no reason for the decision, nor does it give the principle on which it stands. If the bill was dismissed as to the mortgagees, because the receipts of the trustees, or of their agent, even under the circumstances of the case, amounted to an absolute discharge, it would be an express authority for the plaintiff in the case at bar. If the bill was dismissed, because the trustees were liable in consequence of their breach of trust, and were able to make up all deficiencies, it does not affect this case. If the court meant to say, that if the trustees had made these mortgages to secure a debt due from themselves, the mortgagees would yet have held the property discharged from the trust, the decision would appear to me, to be in direct opposition to the principle settled in the sales of chattels by an executor, and to the general principle, that where the act is a breach of duty in the trustee, those who deal with him knowing the fact, are affected by it. To mortgage the property to secure their own debt, would seem to me, to be a direct and palpable breach of duty in the trustees, in which the mortgagee must have fully participated; and, I cannot conceive, tliat the court meant to say, that such a transaction could be innocent. I must therefore suppose, that the decision turned upon the fact, that the trustee himself, who was before the court, was of himself unquestionably competent to pay the money, and ought to pay it. It is true, that if the court proceeded on this idea, the land ought to have been held still responsible ; but the report is too defective and unsatisfactory to warrant any confidence in its being full, as to this point.
These cases then, though they have a strong apparent bearing on that under consideration, are too loosely and too carelessly reported, to satisfy the court that they were decided on principles which they are cited to support. I cannot consider them as proving that land sold for other objects, in exclusion of a debt charged upon it, is relieved by the sale, from that charge, if the purchaser pays with notice *'of the intended misapplication of the purchase money. I repeat then, that it is a question of fact. Did the circumstances under which Mantapike was sold, prove that the purchase money was to be diverted from the payment of George Brooke’s debts, to other objects, with such reasonable certainty, as to leave it probable that a purchaser with notice, would be liable for the application of the purchase money? or, in other words, that the land would, in the event of misapplication, and the insolvency of the trustee, remain charged in his hands?
These circumstances have already been stated. The most prominent are, that William Garnett, was the immediate trustee under Richard Brooke’s will, though considered in a court of equity, as being also a trustee for George Brooke’s creditors, whose claim was prior to that of Richard Brooke’s creditors or legatees, but whose claim the vendor not only did not, but could not safely, mean to satisfy, unless directed by a court of equity so to do. The purchaser had, certainly, reason to believe, that the sale was not made with a view to satisfy the charge created by George Brooke’s will, and that the purchase money, if paid before the institution of a suit by Campbell’s representative, would be applied to the purposes of Richard Brooke’s will. If a suit should be instituted before the purchase money became due under the contract, or before it was paid, the whole affair would then be transferred to the court of chancery, and he would no longer be master of his own conduct. In the one event,, he would take upon himself the hazard of paying with full notice of the charge, money which he had reason to believe, was to be diverted to different objects; in the other, he would be involved in a chancery suit, the course and duration of which, he could not anticipate. Do these difficulties constitute a valid objection to a decree for a specific performance?
It cannot be doubted, that these difficulties, if presented 'to the mind of a prudent man, contemplating the purchase of an estate, and desirous of performing his contract according *to its terms, might have a serious influence on his conduct, and might deter him from making the purchase. If informed of them, after making the contract, but before its execution by the paying of the purchase money and receiving a conveyance, he would have such strong motives for stopping entirely, or at least, for pausing, until the impediments could be removed, as would, I think, justify him, for so doing, in the opinion of any reasonable man. Had this suit come to a hearing as between the vendor and vendee only, on the day on which it was instituted, could a court of equity have pronounced the objections to the title so frivolous, as to decree that Macon should take it, without having those objections removed? Is the exoneration of the land from Campbell’s debt, by a sale to a purchaser, with notice of all the circumstances which had come to the knowledge of col. Macon, so perfectly clear, that a court of equity ought to decree him to take the land and pay the purchase money, without any security against the future demand of Campbell’s representative?
Both on principle and authority7, I think it very clear, that a specific performance will not be decreed on the application of the vendor, unless his ability to make such a title as he has agreed to make, be unquestionable: [Marlow v. Smith,] (2 P. Wms. 201;) [Rose v. Calland,] (5 Ves. jun. 186, 189;) [Roake v. Kidd,] (S Ves. jun. 647;) [Stapylton v. Scott,] (16 Ves. jan. 272;) [Sloper v. Rish,] (2 Ves. and Beam. 149;) and it is equally clear, that a purchaser, under such a contract as that between Garnett and Macon, had a right to expect that an unincumbered estate in fee simple would be conveyed to him. [Omerod v. Hardman,] (5 Ves. jun. 722, 734;) [Flureau v. Thornhill,] (2 Wm. Bl. R. 1078). In a contract for the purchase of a fee simple estate, if no incumbrance be communicated to the purchaser, or be known to him to exist, he must suppose himself to purchase an unincumbered estate, and a court of equity will not interpose its extraor *1186 dinary power of compelling- a specific execution of the contract, unless *'the person demanding it, can himself do all that it is incumbent on him to -do. It has been said at the bar, that the declarations of the chancellors to this effect, have been made in cases where the title itself was doubtful, not where there was a money charge upon the estate, which would not materially affect the purchaser, and which might be paid off by him, without any material change in his contract, and without inconvenience.
This allegation is not, I think, entirely correct. The objection is not entirely confined to cases of doubtful title. It applies to incumbrances of every description, which may, in, any manner, embarrass the purchaser in the full and quiet enjoyment of his purchase. In S Ves. jun. 189, [Rose v. Calland,] the property was stated to be free of hay tithe; and there was much reason to believe that the statement was correct. But the point being doubtful, the bill of the vendor, praying a specific performance, was dismissed. There is, certainly, a difference between a defined and admitted charge, to which the purchase money may, by consent, be applied, when it becomes due, and a contested charge, which will involve the purchaser in an intricate' and tedious law suit of uncertain duration. There can, I think, be no doubt, that Campbell’s claim, controverted as it necessarily was by Brooke’s representative, is of this character, and that the continuance of the charge on the land in the hands of a purchaser with full uotice of that claim, and of all the circumstances under which the sale was made, was too questionable to be disregarded as entirely frivolous, if alleged in a suit between Garnett and Macon only, fora specific performance. If it could not be entirely disregarded by a court, Macon was certainly justifiable in refusing to proceed while this cloud hung over the estate. ' He was certainly justifiable in referring the case to a court. He was justifiable in refusing to take the title which could have been made in January 1819.
But although it was not in the power of Garnett to make a perfectly secure title, previous to a decree which would ^'dispose of Campbell’s lien, it is undoubtedly now in his power. All the parties are now before this court, and if a specific performance should be decreed, the title which can be • made to Macon, will undoubtedly stand clear of Campbell’s lien. The question, therefore is, whether the contract ought now to be enforced.
It has been repeatedly declared, both in the courts of England and of this country, that lime is not of the essence of a contract ; and that a specific performance ought to be decreed if a good title can be made at the time of the decree.
This principle is sustained by many decisions, and by the practice of the court of chancery in England to refer it to a master, to report whether the title be good at the time. But, I do not think that the Euglish court of chancery has ever laid down the broad principle, that time was never important, and that an ability to make a clear title at the time of the decree, arrested all enquiry into the previous state of things. On the contrary, if. a person sell an estate, to which he has no title, he cannot, though he should afterwards acquire it, enforce the contract. There is an implied averment in every sale made without an explanation, that the vendor is able to do what he contracts to do. If he is not, and the vendee sustains an injury in consequence of this inability, it would seem unreasonable, that the contract should be enforced ; it would be the more unreasonable, if the amount of the injury should not be the subject of exact calculation. It is a general rule, that he who asks the aid of a court of equity, must take care that his own conduct has been exactly correct. It would be strange, if this general rule should be totally inapplicable to time, in the execution of a contract. If the day be careless "y or accidentally passed over without making a conveyance, and no serious inconvenience result from the omission, the objection would be captious, and would very properly be discountenanced; but if the vendor was unable to clear up the title, until such an alteration had taken place in the state of things, as materially *to affect the parties, time, I think, cannot in reason, be deemed unimportant. It is settled, that mere inadequacy of price, is not a’ sufficient ground for a court of equity, to refuse its assistance, unless the difference between the sum to be given and the value of the land, be so enormous, as to countenance the idea of fraud or imposition. Yet, if an unreasonable contract be not performed according to its letter, equity will not interfere. (Sugd. on Vend. & Pur. 190, [2 Am. Ed.]) Between a contract which is unreasonable when made, and one which has become so before it cau be executed, if the application be made by the person in fault, for the aid of the court against the party who has suffered by his inability, no clear distinction is perceived.
In the case of Gibson v. Patterson et al. (1 Atk. 12,) lord Hardwicke, is reported to have paid no regard to the negligence of the vendor in producing his title deeds. But that case is said by subsequent judges, who have inspected the record, to be mis-re-ported; and if it were not, it does not appear that there was any incumbrance on the estate, or that the condition of the parties had been affected by the delay.
In Morgan v. Shaw, (2 Meriv. 140,) the chancellor said, “The inclination of my opinion is against the old doctrine, that time is in no case of the essence of the contract,” and in 4 Bro. C. C. [Fordyce v. Ford,] 498, the master of the rolls said, I hope it will not be supposed, “that a man is to enter into a contract, and think that he is to have his own time to make out his title.” In Harrington v. Wheeler, (4 Ves. jun. 686;) and Lloyd et al. v. Collett, (4 Bro. C. C. 469,) time was held material.
I think that the present doctrine of the court of chancery of England, is clearly in favour of the opinion, that where time is really material to the parties, the right to a specific performance may depend upon it ; and I think that the same doctrine prevails in the courts of the United States. Hepburn and Dundas v. Colin Auld, (5 Cranch, 262,) was a suit for a specific performance, which *1187 was objected to by the vendee, because 6,000 acres of land, sold by Hepburn *and Hundas, was not held by a title in severalty, but was an undivided interest in a much larger tract, and that the time of executing the contract was, in that case, material. On that point the court says, [p. 276,] “it is not to be denied that circumstances may render the time material ; and the court does not decide that this case is not of that description. But the majority of the court is of opinion, that the estate is to be considered as an estate held in sever-alty.” It was also said in Pratt et al. v. Law and Campbell, (9 Cranch, 456, 494,) that time is made material to the specific performance of a contract, whenever, from the change of circumstances, a specific performance, such as would answer the ends of justice between the parties, has become impossible.
In Brashier v. Gratz et al. (6 Wheat. 528,) the case was this: Michael Gratz, residing in Philadelphia, sold in March 1807, to Walter Brashier, residing in Kentucky, a tract of land lying in Kentucky, which Gratz had purchased, and for the title to which a suit was then depending. Brashier gave his notes for the purchase money, and agreed to attend to the prosecution of the suit, for which service an allowance was made him in the price of the land. The land was sold at twenty-two dollars fifty cents by the acre, and it was agreed, that if any part of the land should be lost by the decision of the court, Gratz should re-pay eleven dollars twenty-five cents for each acre that might be so lost.
The suits were not pressed to a decision, and in 1811, the fees were demanded from Gratz, and were paid by him. in 1811, Brashier came to Philadelphia, and his notes being protested for non-payment, Gratz required that they should be paid, or that the contract should be rescinded. Brashier was unwilling to do either, and the question, whether Gratz was still bound by it, was left to arbiters, who decided that he was. Brashier became insolvent, and Gratz took the management of the suits into his own hands, which were decided in his favour, in 1813. About this time, the lands rose suddenly in value, on which, Brashier tendered *payment of his notes, and demanded a conveyance of the land. Gratz refused, and the bill was brought for a specific performance. It was dismissed in the circuit court, and the plaintiff appealed to the supreme court, where the decree was affirmed.
It will be readily admitted, that the case of Brashier and Gratz, was a strong one, against the plaintiff — much stronger, — than that, now before this court ; but the principles laid down in its decision, apply to all cases where the party demanding the aid of the court, has failed to perform his part of the contract, and a change in circumstances, unfavourable to the party resisting the demand has taken place. The court says, [p. 533, 534,] “the rule, that time is not of the essence of a contract, has certainly been recognized in courts of equity ; and there can be no doubt, that a failure on the part of a purchaser or vendor, to perform his contract on the stipulated day, does not, of itself, deprive him of his right to demand a specific performance at a subsequent day, when he shall be able to comply with his part of the engagement. In may be in the power of the court to direct compensation for the breach of contract in point of time, and in such case, the object of the parties is effectuated by carrying it into execution. But the rule is not universal. Circumstances may be so changed, that the object of,the party can be no longer accomplished, that he who is injured by the failure oí the other contracting party, cannot be placed in the situation in which he would have stood, had the contract been performed. Under such circumstances, it would be iniquitous to decree a specific performance, and a court of equity will leave the parties to their remedy at law.”
“If, then, a bill for a specific performance be brought by a party who is himself in fault, the court will consider all the circumstances of the case, and decree according to those circumstances.”
In reviewing the circumstances of the case, the court says, [p.539,540,] “Another circumstance which ought *to have great weight, is the change in the value of the land. It was purchased at twenty-two dollars fifty cents per acre. Mr. Brashier failed to comply, and was unable to comply with his engagements. More than five years after the last payment had become due, the land suddenly rises to the price of eighty dollars per acre. Then he tenders the purchase money, and demands a specific performance. Had the land fallen in value, he could not have paid the purchase money. This total want of reciprocity, gives increased influence to the objections to a specific performance, which are furnished by this great alteration in the value of the article.”
The change in the value of the article in the case which has been cited, between the time when the money ought to have been paid, and the time when the money was tendered, was certainly enormously great, much greater than can take place in ordinary times; but the principle does not depend entirely on the excessiveness of that change. The principle undoubtedly is, that a very great change in the value of the article, constitutes a serious objection to a decree for a specific performance, when claimed by the party whose fault it is, that the contract has not been executed.
In the case under consideration, a considerable change has taken place, in the value of the article ; and that change has been produced by a general declension in the price of lands. It must therefore materially affect the arrangements to be made by the purchaser for a compliance with his contract. The same property which, if sold in time, would probably have enabled him to pay for Mantapike, would not on any reasonable estimate, now enable him to do so. If, then, William Garnett was unable to convey a perfectly safe title in January 1819, Mr. Macon has sustained an injury by the suspension of his proceedings, the amount of which admits of no certain calculation, and which is probably equivalent to the difference in the value of Mantapike at that time and at this.
* Although I am entirely satisfied *1188 that there is no moral taint in this transaction, that the omission to give notice of Campbell’s debt was not concealment, to which blame, in a moral point of view, can be attached ; yet a court of equity considers the vendor as responsible for the title he sells, and as bound to inform himself of its defects. The purchaser in making a contract may be excused for relying on the assurance of the vendor, implied in the transaction itself, that he can perform his agreement.
As I think Campbell’s claim was a cloud lowering over the title Garnett could convey to a purchaser with notice, which justified Macon in refusing to go on with the contract, which cloud cannot be dissipated but by the decree of a court of chancery, and as before such a decree was attainable, the value’ of the article has greatly changed, that circumstance creates a strong objection to a specific performance. At the same time, it must be perceived that the vendor, who has committed no moral wrong, and who is now able to perform his contract, will sustain all the loss arising from the depreciation of the property, which he might have sold to another, had not Macon purchased. I felt some hesitation between a decree dismissing the bill, and a decree for carrying the contract into execution, considering the vendor who has retained possession of the property as entitled to the profits, and the vendee who was justifiable for not proceeding with his contract, as exempt from the payment of interest. But, on reflection, I have come to the opinion, that as there is no fault in the purchaser, and as there was some remissness in the seller in not communicating Campbell’s claim, that the whole disadvantage ought to fall on the vendor, and that his bill ought to be dismissed.
The point which has weighed heaviest on my mind, and about which I have felt the greatest difficulty, concerning which I have indeed at different times inclined to different opinions, is whether the sale under the will of Richard Brooke, is, under all the circumstances of the case, to be considered as such a breach of trust, as respects the creditors *of George Brooke, as will involve a purchaser, 'having notice before the contract of sale is carried into execution, in the consequences. I am rather disposed to the opinion that it is such a breach of trust. At all events, I am satisfied that it wears such a serious aspect, as to justify a purchaser in refusing to proceed.
Decree, — bill dismissed, — each party to bear his own costs.